JAMES D. SUTTON *vs.* ROBERT CRAIN, Adm'r C. T. A. of HENRY WATTS.—*December,* 1839.

It is settled, that the bequest for life, of the *use* of a female slave, vests in the legatee a property in the issue born during the existence of the life estate, upon the principle, that the issue is to be considered, not as an accessary, but as a part of the use, to go to the person to whom the use is limited.

The assent of the executor is indispensably necessary to perfect the title of the legatee of a slave, and this is equally true with reference to the issue of a female slave, born whilst the mother, the subject of the legacy, is in the possession of the legatee. No title to such issue can be maintained, without proving the assent of the executor to the bequest of the mother.

Such assent may be presumed from facts and circumstances, but a prayer taking that question from the jury, and submitting it to the court as a legal presumption, was properly refused by the county court.

APPEAL from *Saint Mary's* County Court.

This was an action of *Trover,* commenced on the 4th day of July 1837, in which the plaintiff, now appellee, declared

that, in the year 1832 *Henry Watts* was possessed of certain negro slaves of great value, &c., to wit, negro slave called *Sarah*, and being so possessed thereof, having made his will in due form of law, departed this life, and afterwards and before the granting of the letters of administration *c. t. a.* to the plaintiff, and before the appointment and qualification of an executor of the said *Henry*, the said *Sarah* had issue of her body a certain negro slave called *Mary*, of great value, &c., and afterwards and before the appointment of an executor or administrator as aforesaid, the said negro *Mary* was casually lost, and then and there came into the possession of the said *James D. Sutton* by finding; and after alleging the appointment and qualification of the plaintiff as, &c., charged the defendant with a refusal to deliver the slave *Mary* to the plaintiff, and a conversion of her to his, the defendant's, own use, &c., &c. The defendant pleaded *non cul, et non cul infra tres annos*, on which pleas issues were joined.

*1st Exception.* At the trial of the cause, the plaintiff offered in evidence the letters of administration granted to him by the orphans court of *Saint Mary's* county on the 13th June 1826, on the personal estate of *Henry Watts;* that the said *Henry Watts* departed this life in the year 1819, having first executed his last will and testament, as follows:

"I give and bequeath to my loving wife *Sarah Watts* and her heirs, in lieu of her third part of my estate, the following property, viz: one negro man *Jess;* one negro woman *Catharine* and her three children; all the household furniture she had when we were married; my carriage and carriage horse; six ewes; three cows and calves and ten head of hogs (her choice); also, during her life only, the use of one third part of all my real property; also, during her life the use of negroes *Nell, Anna* and *Daniel*, after which they and their increase to be the right and estate of my son *Richard Henry Watts.* I give and bequeath to my grand-daughter *Susan Elizabeth Watts*, one negro girl by the name of *Lydia*, and her increase. To the creditors of my deceased son *George Hawkins Watts* I give all the stock and furniture belonging to me at his death he had in

his use and occupation, provided an equitable dividend of the same can be made by the whole of them, within six months after my decease: otherwise, I bequeath the said stock and furniture to the children of my said son *George H. Watts;* and to said children and their heirs I give the following property: negro man *Perry*, negro woman *Amey* and all her children, and negro woman *Sarah*, to be paid to them when they arrive at age, and no distribution of the same to be made among them until that period.    And I direct that the profits arising from the hire or use of said negroes, be applied towards their education and maintenance respectively, until a division of the same under this my will can take place; and in case either of them shall die before they arrive at lawful age, then I give the share of him or her so dying, unto the survivor or survivors of them.    It is however my desire that their mother, *Ann Watts*, shall have the exclusive use of negro *Sarah* until the youngest of my said grand-children arrives at age."    After some other directions not material, the testator constituted his son *Richard Henry Watts* residuary legatee of his real and personal estate, and executor of his will.

The plaintiff further proved, that the negro woman *Sarah* came to the possession of *Mrs. Ann Watts* immediately after the death of the said *Henry Watts*, and so continued until all the children of *Ann Watts* arrived at full age; that negro girl *Mary*, the subject matter of this suit, was the daughter of negro *Sarah*, who is bequeathed in said will to *Mrs. Ann Watts*, and born after the death of *Henry Watts*, and after her mother *Sarah* came to the possession of *Mrs. Ann Watts*, in accordance with the will of the said *Henry Watts*, and long before the youngest of *Mrs. Ann Watts's* children came of age; that *Mrs. Watts* claimed negro *Mary*, exercised acts of ownership over her, and sold and delivered her to defendant, on the 10th November 1834, and that the defendant in this cause, afterwards, in 1836, sold said negro girl *Mary*, and received the amount of money for which she sold to his own use.    Whereupon the defendant prayed the opinion and direction of the court to the jury, that from these facts, if they believe them to

be true, the plaintiff is not entitled to recover, because negro *Mary*, the property in dispute, was the property of defendant, which opinion and direction the court refused to give. The defendant excepted, and the verdict and judgment being against him, he brought the present appeal.

The cause was argued before BUCHANAN, C. J., ARCHER, DORSEY, CHAMBERS, and SPENCE, J.

McMAHON for the appellant.

This is an action of *trover*, brought by the appellee, as administrator with the will annexed of *Henry Watts*, against the appellant, to recover for the conversion of a slave called *Mary*. The issues in the case were on the pleas of not guilty, and limitations.

The appeal is from the refusal of the court below to grant the prayer submitted on behalf of the appellant.

1st. The proposition submitted on behalf of the appellant is, *that the bequest of the exclusive use of negro Sarah to Mrs. Ann Watts, entitled her to the child Mary, who, it is conceded, was born at a period when, by the will, Mrs. Watts had a right to the exclusive use of the mother Sarah.* And if so, the judgment must be reversed, as it is admitted that the defendant purchased *Mary* from her.

Upon referring to the bequest, it will be seen, that after giving several named negroes to his grand-children when they all arrived at age, and the profits from their hire in the intermediate period for their maintenance, he then excepts *Sarah* out of this bequest so far as to give the *exclusive use* of her to *Mrs. Watts* until the youngest of them arrives at age. The use and all the profits of the use or employment of *Sarah* during that period enured to *Mrs. Watts*. She was during that period the usufructuary, to the fullest extent, as it regards *Sarah*.

If there had been a like devise of *the use of Sarah to Mrs. Watts for life*, with remainder over to her children, and *Mary* had been born during her life estate, it is settled by the decisions of our courts, that *Mrs. Watts* would have been absolutely

entitled to *Mary*, as the increase during her life estate.  *Scott vs. Dobson*, 1 *Harr. & McHen.* 160, and *Somerville vs. Johnson*, 1 *Harr. & McHenry*, 348, &c., conclude this question.  And they establish that there is no difference as it regards the right to the increase, between a devise of the mother for life, and a devise of the use of the mother for life.  In the case of *Somerville vs. Johnson*, the bequest (which appears in 1 *Harr. and McHen.* 348,) was *"of the use of* the named negroes during her life;" and she was by such bequest of the *use* held to be entitled to the increase; nor can there be any sensible distinction, with reference to this question, between the bequest of the mother for a limited period, and the bequest of *"the use,"* or as in the present case, *"of the exclusive use"* of the mother. It will be seen by reference to the decisions, that the right to the use, and to the perception of the profits arising from that use, and the loss of the use consequent upon the pregnancy and delivery of the mother, coupled with the obligation to take care of and sustain the issue, form the chief foundations of the right to the increase.  The grounds of the decision are not fully disclosed by the report, but they are stated by *Mr. Dulany*, in the opinion given by him to the Governor acting as Chancellor.  See 1 *Harr. & McHen.* 353, in which opinion he considers the question so fully established by the previous decision, as not to admit of doubt.

These decisions have never since been questioned; but have on the contrary been since recognized in several cases; as in *Standiford vs. Amos*, 1 *Harr. & John.* 526, where the representative of the legatee for life of a slave was held to be entitled to the issue born during the life estate, as against the remaindermen: and in *Hamilton vs. Cragg*, 6 *Harr. & John.* 18, the analogous case of *Chew vs. Gary*, 6 *Harr. & John.* 526. In the case in 6 *Harr. & John.* 18, his Honor Ch. J. BUCHANAN delivered the opinion of the court: after citing the above mentioned cases from 1 *Harr. & McHen.* and 1 *Harr. & John.* says, "by these it is settled, that where a negro woman bequeathed to one for the life of the legatee, has issue during his life and after the death of the testator, such issue shall belong

to the legatee, *on the ground that the issue is to be considered not as an accessary, but as a part of the use, and to go to the person to whom the use is limited."* Acc. also, per *Baltimore* County Court, ARCHER, C. J., in 7 *Harr. & John.* 263.

It only remains then to inquire, whether there is any difference, as it regards the right to the increase, between a bequest "of the use for life," and a bequest "of the use until some future event occurs," or as here, a bequest of the exclusive use until the youngest of his grand-children, the children of his son *George*, arrive at full age. And it will be at once obvious, that, looking to the grounds of these decisions, no such distinction can be established. They are both gifts of the use until a future event occurs, the one being a gift of the use until he, the legatee, dies—the other of the use until another legatee in remainder arrives at age. But it is not the duration of the use, the time for which it is limited, or during which it may possibly continue, nor the event by which it is determined, that give or determine the right to the increase. The issue go to the legatee entitled to the use at the time when the issue is born, "on the ground" (to use the above quoted language of this court in 6 *Harr. & John.* 18,) *"that it is considered not as an accessary, but as a part of the use, and to go to the person to whom the use is limited."* It passes, therefore, *"as a part of the use;"* and the legatee entitled to the use of the issue as born, takes it as a part of the use.

Nor can it be contended that the terms used in this bequest were only intended to give the mere right to the services of *Sarah;* and that the right to these was all that passed. The present case is even stronger than any of the cases referred to. The case of *Somerville vs. Johnson*, 1 *Harr. & McHen.* 348, settles the construction as to the bequest of the *use*. That it includes not only the right to the services of the woman, the subject of the bequest, but also to her increase as a part of that use; and the bequest in this case is in stronger language, being of the *"exclusive use."* And it will be seen, also, by referring to other parts of the will of *Watts*, that he himself saw the import and force of such terms, and avoided them by the

use of express words to pass over the increase to the remaindermen. Thus after making several bequests to his wife, he also bequeaths "to her during her life *the use* of negroes *Nell, Anna* and *Daniel*, after which they and their *increase* to be the right and estate of his son *Richard*." And so also in the next bequest of negro *Lydia*, he also expressly bequeaths her increase, whilst the bequest over to his grand-children, which is under consideration, is merely of those named, (omitting all mention of the increase,) to be *paid*, i. e., *divided*, &c. amongst the children when of age. See also *Evans & Iglehart vs. Merriken*, 8 *Gill & John*. 48, 49.

*Secondly*. Conceding then that *Mrs. Watts* was entitled to *Mary*, the increase during her right to the use of the mother *Sarah*, and that the defendant, as purchaser from *Mrs. Watts*, is entitled to her right, can it be contended, under the circumstances of this case, that the appellee, as administrator, was entitled to recover her merely because it is not expressly stated that he had assented to this bequest.

*Mrs. Watts* was in the uninterrupted enjoyment of *Sarah* from 1819 until the 4th of July 1837, the day on which this action was brought. It does not conclusively appear that the executor never acted, so as to repel the presumption that he assented. The record states that the appellee offered in evidence his letters of administration with *the will* annexed; but *it does not necessarily therefore follow*, that they were not letters de bonis non, which, where there is a will, are letters with the will annexed. The probat of the will, which it is a part of the duty of the executor to cause to be made, was on the 11th December 1821, which was shortly after the death. There seems to be some error in the statement as to the time of the death, as the will is dated 1st July 1821, and the testator is stated to have died in 1819; but still the exception states that he died in 1819, *having first made this will*, so that the only effect of the statement uncorrected, is to make the date erroneous. But whether the executor ever acted or not, the appellee obtained his letters of administration on the 13th June 1826; and from that period until the 4th July 1837, a period

of eleven years, *Mrs. Watts* and the defendant claiming under her, were suffered by him to remain in the undisturbed possession of this slave. The presumption therefore is, after such a lapse of time, that all the objects for which the law permits the executor to retain the property, and renders his assent necessary to perfect the title of the legatee, had been accomplished. It cannot be contended, after such a lapse of time, that there remained any debts to be paid; nor can it be presumed that during this long interval the enjoyment of this bequest by *Mrs. Watts*, and those claiming under her, had been without his assent. His long acquiescence in this enjoyment was, if not conclusive evidence, yet presumptive and conclusive until rebutted by contrary proof (and there was none such) that the enjoyment was by his assent. In support of this proposition the court are referred to 2 *Williams on Executors*, where it is said—"In certain cases the assent of the executor may be presumed, upon the principle that, in the absence of evidence the executors shall be taken to have acted in conformity with their duty, as when executors die after the debts are paid but before legacies are satisfied: *so also as it should seem the assent of an executor may be concluded from the legatee's possessing himself of the subject bequeathed, and retaining it* for some considerable time without complaint by the executor. (2 *Wms. on Ex'rs*, 848.) And in *Matthews on Presumptive Evidence*, 278, where the last proposition is stated in the very terms used in 2nd *Williams*. The writer adds in support of it, "for as very slight circumstances (for example, a congratulatory address) are in general sufficient to denote an executor's agreement to a legacy, so it is conceived *that long acquiescence*, which in all cases of this kind is esteemed a significant and important circumstance, may, *without the aid of other marks of assent*, be regarded as affording the requisite presumption. Where the bequest is of property yielding an annual income, as a leasehold tenement, and the executor allows the *profits* to be appropriated by the legatee, the argument for the implied assent is manifestly stronger." And in 3 *Preston on Abstracts*, page 145, where the writer is treating of this subject, he applies to

this question of assent the established maxim, "that *ex diuturnitate temporis omnia presumuntur esse rite et solemniter acta;*" and therefore he says, that in such transactions which took place at a remote period, a title depending either on an assignment by an executor, *or by a legatee without any express evidence of assent,* is accepted without any difficulty.

Now in this case not only had at least 16 years elapsed from the period when *Mrs. Watts* obtained the possession of the bequest, and 11 years from the time when the appellee became administrator, and not only had *Mrs. Watts* during this long interval taken to herself all the services and profits of this property, but it appears also from the record, that in 1834 she sold the child *Mary* to the appellant; that the appellant himself was suffered, without interruption by the appellee, to enjoy this property until 1836, when he sold her; and that this action was not brought until after the appellant had sold *Mary,* having first held her as his, for about two years before the sale.   And it is submitted therefore, that under these circumstances, assuming the bequest to have passed this property, and to require nothing but proof of assent to perfect the appellant's title—not only ought the assent to be presumed, but that it would operate as a fraud upon the appellant to permit such an objection to be set up against the appellant by an administrator lying by during all this period, and only coming forward to claim the property after the appellant had parted with it.   And to add to all, it will be remarked, by referring to the statement of the proof, that this objection is never set up, if indeed it can be considered as made or involved in the question before the court, until after *Mrs. Watts's* whole period of use under the will, as to the mother, has gone by.

The circumstances of the case are so strong and conclusive on this view of the question, that it is not necessary to enquire whether such an objection could apply to issue never held or owned by the testator, but born whilst the mother was in the possession of *Mrs. Watts,* by the acquiescence of the appellee.

And it may be remarked in conclusion on this branch of the subject, that assuming the assent of the administrator, which,

once made, can never be recalled, or the existence of facts establishing it by presumption, the plaintiff had no right of action, whether *Mrs. Watts* was or was not entitled to *Mary* absolutely, as a part of the use. The assent of the executor or administrator, in a case where there is a bequest to one with remainder over, if given to the first legatee only, enures not only to her benefit, but also to the benefit of those in remainder, so as to pass the whole title out of himself. (See 2 *Williams on Executors*, 847, and the various authorities there cited.) And, therefore, assent to *Mrs. Watts's* taking possession of *Sarah*, at once vested the legal title to the remainder in the grand children; and even if it be conceded that *Mary* the issue, did not belong to *Mrs. Watts*, but to those in remainder, the right to maintain this action was not in the appellee, but in the grand-children in remainder;—and in this case, the possession being in us, it did give us the property at all events as against the appellee.

*Lastly.* If it even be conceded that there was no evidence of assent, and nothing to warrant the presumption of it, and that the devise did not pass *Mary*, then it is submitted that the property was in us by the lapse of time and the operation of the statute of limitations.

The exception expressly states, that long before the youngest of *Mrs. Anne Watts's* children came of age, *Mrs. Watts* claimed negro girl *Mary*, and exercised ownership over her, and sold and delivered her to the defendant in this cause on the 10th of November 1834, showing that she always held and claimed her as her own. And if the administrator never assented, then it was a widow's taking and holding under a claim of right, and as to *Mary* not a limited but an absolute claim. And if it be said that the statement of the exception, "that *Sarah* the mother, came to the possession of *Mrs. Watts* "*in accordance with the will*," imports a taking and claim by her under the will, then the statement extends still further, for it involves the admission that it came to her by the assent of the administrator; and thus ended the objection for want of assent. If it came to her in accordance with the will, it of

course came by the assent of the executor or administrator, whose duty it was to carry into effect the provisions of the will. And if it does not import this, it only imports, not that she took it under the will and so claimed it, but that the will accorded with her taking possession of it, which might be, and was, even if she took it, not claiming under it. The expression is not that she took possession of it, in accordance with the will; but that it came to her possession in accordance with the will, which, if it proves any thing more than that the will accorded with her then possession of it, proves that it came by the assent or delivery of the executor. And even these expressions apply only as to *Sarah;* for as to *Mary* the daughter, the statement shows that her claim *ab origine* was of the absolute right to *Mary*.

For all which reasons it is submitted that the judgment of the court below ought to be reversed.

ALEXANDER for the appellee.

1. The counsel for the appellant first insists, that by the true construction of the bequest, the issue born during the continuance of her interest in the mother, belonged to *Mrs. Watts* absolutely. And the cases referred to by the learned counsel clearly show, that where there is a bequest of a woman slave, or of the use of a woman slave for *life*, with a remainder over, the legatee for life will take absolutely all the increase born during the continuance of his life estate. But there is no case to be found in which it has been adjudged that a legatee for a term of *years* would be entitled to increase born during the continuance of his term for years. It may be admitted that the case of the legatee for years is within the reason upon which the cases affirming the right of the legatee for life, were decided. But all these cases, in the opinion of the late celebrated *Daniel Dulany*, were departures from the principles of humanity and law. *Mr. Dulany* thought that the first adjudication ought to be followed in a like case, for the sake of repose and security of property; and he sustains himself by the opinion of a very eminent chancellor, who declared that "the

rules of property being certain and known, it is not of great consequence what they are." But is it hence to be inferred, that an exception to a rule of property being once established, must thereafter be preferred to the rule itself, in the adjudication of kindred cases? Or is it not rather the habit of the court to treat the exception as an anomaly or a precedent which is to be confined strictly to the very point decided? The contest in this present case is, whether the exception or the principle shall prevail.

There is a broad legal distinction between a freehold and a chattel interest in real estate. And a distinction equally well founded in humanity and justice may be taken between the interests of a legatee for life, as settled by the adjudged cases, and the interests of a legatee for years of a female slave. A term for a thousand years is, in contemplation of law, no more than a term for a single day; and the cases referred to by the appellant's counsel show that, in law, there is no difference between the right of a legatee deriving title to the slave under a last will and testament; and a devisee or grantee who claims under a gift or other conveyance intervivos. The increase passes, say the cases, as part of the use. Hence, if the legatee for an hundred years can claim the issue of the slave born during that time, a like claim might be inferred by one who had hired a woman slave for a year, or a month, or a day, to the issue born during this transient term. But is it law? Can it be law, in consistence with humanity, that the hirer of a woman slave for a month, shall hold on to the issue which may fall during that month? Why, then, may not the hirer of a free negro woman, or the master of a female apprentice, be permitted to claim the increase of his servant or apprentice, born during her term of servitude? Is not the increase a part of the use in the one case, as justly and clearly as in the other? Is it not as just in the one case as it is in the other, that the increase should go to the master "as a reasonable satisfaction for the expense of maintenance, and for the time lost by the parent?" Difficulties innumerable, it is conceived, may flow

from the extension of the exception to legatees, claiming less than a life estate in the mother.

But assuming, for the sake of the argument, that the cases adjudged in reference to the rights of the legatee for life, must in general, control the question in regard to the rights of a legatee for a term of years; it is yet competent for us·to argue that, upon the present will, there is an intent expressed that *Mrs. Watts* shall not have the issue born during her interest in the mother. By adverting to the will, it will be found that the children take an estate in all the negroes vested in point of interest, though future in regard to enjoyment, and vested and present, even in regard to the perception of the profits. Here is a complete disposition .of the negroes, and their increase, and their profits; made in terms which evidently import that the distribution is postponed, simply from regard to the circumstances of the legatees. It is under a subsequent, and, as it is contended, an inconsistent devise, that *Mrs. Watts's* right must be derived. But is there, indeed, any inconsistency in these various dispositions? We think the discrepancy is apparent only, and that an explanation may be given of the whole, which will enable the court to gratify the direction in favor of *Mrs. Watts*, without lessening the interest or estate which has been previously given to the children. The principal objects of the testator's regard are the children; and *Mrs. Anne Watts* is respected simply as their mother. Hence it is, that the bequest in her favor is limited, to expire upon the children's attaining a legal capacity to dispose of or manage their property, and it is given in such form as to leave it questionable, at the least, whether it would not be determined by her death, during the infancy of her children.

The mother's interest is, therefore, to be treated as subsidiary to that of the children. The children are to have the profits arising from the hire *or use of all the negroes. Mrs. Watts* is to have the exclusive *use of one of those negroes.* Here it will be insisted, is a contradiction. But we submit the contradiction will be avoided, and the two claims will be reconciled by giving to the expression *use* in one of those clauses,

the same construction which the same expression must receive in the other. *Use* in the first clause is evidently put for *service* or *labor.* The bequest is thus made to import "the profits arising from the hire, service or labor of the negroes." The direction that *Mrs. Watts* shall have the *use* of one of those negroes, is to be construed as a direction that she shall have the *benefit of the labor or service* of the negro, or that the negro shall be left in her *service or employment.* A bequest of this limited character could not be made to carry to the legatee the issue born during her right to the services of the mother. The purpose to which the profits of the negroes was to be applied, and the relation subsisting between the legatees, supply an additional argument in favor of our construction. The profits were to be applied to the maintenance and education of the children, who were, it is to be presumed, under the fostering care of the mother; and the girl *Sarah* is left in the service of the mother, in order that she may be at the same time a personal attendant on the children. Thus the children are made to enjoy the profits of all the negroes; the others being directed to be hired out or worked for their support. We may remark, too, that if the issue of *Sarah* will pass to *Mrs. Watts* as a part of her use, then the issue of *Anney*, as part of her use, will be applicable to the maintenance and education of the children, and as each is born would be liable to be sold for that purpose.

The counsel for the appellant has referred to other clauses of the will to show, that the testator specially gave the increase, when he designed that the increase should pass. In one clause he bequeaths to his wife the *use* of certain negroes, male and female, during her life; after which they and their increase are to be the right and estate of his son *Richard.* This clause is very correctly drawn; and if it stood alone might afford color to the argument made on the other side. But when it is considered in connexion with the next succeeding clause, wherein he bequeaths to his daughter absolutely a negro woman *Lydia* and her increase, it will warrant the inference that the testator was not remarkable for his sense of

the force of technical expressions. There is indeed great rea-
son to believe, that the will was drawn without knowledge of
adjudged cases or principles, and that the testator selected
language which, in its usual acceptation, seemed to him cal-
culated to express his intentions. Adopting this suggestion,
it deserves remark that, just preceding the bequest to the wife
for life of the *use* of several negroes, he had devised to her du-
ring her life only, the *use* of one-third of all his real estate.
The expression *use* is therefore to be found in four parts of this
will. In the first, in connexion with a devise of real estate,
it imports a right to cultivate the soil. · In the second and
third, it imports nothing more than a right to the labor and
services of slaves. In all these instances the expression is
used in its ordinary acceptation. May we not reasonably con-
clude, then, that in the last clause in which it is found, it is
made in a like vulgar sense?

2. The next proposition advanced on the other side is, that
the administrator with the will annexed assented to this be-
quest in favor of *Mrs. Watts*. It is conceded by the appel-
lant's counsel, that such assent is necessary to be shown, in
order to perfect the right of the appellant, as the assignee of
*Mrs. Watts*, to the slave in question. He likewise admits, that
such assent has not been directly proved; but insists that, from
the circumstances in proof, it may and ought to be presumed
to have been given. On the part of the appellee it is admit-
ted that assent as a fact may be proved expressly, or inferen-
tially, from pregnant circumstances. It may also be admitted
that, from the circumstances proved in this cause, the jury
might have presumed the assent of the administrator to the
bequest in question; and still further, that on a prayer rightly
framed for the purpose, the court ought to have instructed the
jury that it was competent for them, from the proofs offered, to
make such presumption. But we insist that no such question
of presumption is involved in the point or proposition made
by the prayer of the appellant to the court below. The very
point presented to the court below, and none other, is, the
point which is to be considered on this appeal. What then is

the point? *That from these facts* (stated in the bill of excep-
tions to have been in proof to the jury,) *if the jury believe
them to be true, the plaintiff is not entitled to recover, because
negro Mary, the property in dispute, was the property of the
defendant.* Or, in other words, that the facts offered in evi-
dence, if believed to be true, showed that negro *Mary* was the
property of defendant, and therefore the plaintiff is not enti-
tled to recover. If this prayer had been granted, the court
would have left it to the jury to find, whether the facts enume-
rated in the bill of exceptions were proved to their satisfac-
tion, and if they were, then it would have amounted to a per-
emptory instruction, that those facts proved the legal right of
property to have been in the defendant, and therefore, as a
legal consequence, the plaintiff could not recover in the action.
By charging the jury with the facts enumerated alone, the court
would necessarily have prohibited the jury from finding any
other fact which, in the absence of an instruction, they might
have presumed from the facts enumerated. The court would
have said, these facts enumerated conclusively establish a right
of property in the defendant; no inference or presumption is
necessary to be drawn therefrom in aid of the defendant's
right; nor can any inference or presumption be legally made
from those facts to the prejudice of that right. Such would
have been the effect of an instruction given in the form sug-
gested by the *defendant's* prayer. And the first objection to
the prayer in this form is supplied by the argument of the
appellant's counsel, who admits that the assent of the admi-
nistrator to the bequest in favor of *Mrs. Watts* was a fact ne-
cessary to be proved, and that such assent is not one of the
facts enumerated in the bill of exceptions as proved or at-
tempted to be proved.

If the defendant below wished to obtain an opinion upon
the legal sufficiency of the evidence, as furnishing a reasona-
ble implication of the fact of assent, then ought his prayer to
have been framed upon the hypothesis that the jury should be-
lieve the facts enumerated, and from those facts should pre-
sume that the requisite assent had been given. Very differ-

ent, however, is the frame of the prayer which is to be found in the record. The fact of assent is not put to the jury in any shape, as a fact to be found in order to complete the defendant's title. On the contrary, the prayer necessarily assumes that assent, and dissent were entirely beside the issue. If it is admitted that the assent of the administrator might have been presumed from the testimony, we may fairly argue, that there was evidence from which a jury might have refused to infer that assent had been given. This is all that is necessary to be made out for the purposes of the argument. If no evidence was offered of assent, then the defendant's case was defective. If there was evidence relevant to that issue, then it was the province of the jury to weigh that evidence, and to draw such inferences from that evidence as they thought it warranted. In the case of *McElderry vs. Flanagan*, 1 *Harr. & Gill*, 320, it was decided by this court, that a case in which evidence pertinent to the issue has been given, cannot be withdrawn from the consideration of the jury, unless the party who submits the prayer will admit the truth of the testimony offered by his adversary, and of the testimony given by himself, which may operate in his adversary's favor, and the existence of all material facts deducible therefrom, even though contradicted in every particular by the testimony offered by himself. Such are the conditions to which a party must subscribe who would desire to substitute the judgment of the court for a verdict of the jury. Has the defendant below fulfilled these conditions in his prayer to the court below? Instead of giving to the plaintiff the benefit of the presumption, that the property in controversy had fallen into the defendant's possession without the plaintiff's assent, (which is a material fact, legally deducible from all the testimony,) he claims the benefit of the presumption of assent, and of every other fact which may involve the perfection of his title. He admits nothing more than the facts enumerated in the statement as proved. He asks only that the jury shall find the verity of these specific facts; and insists that such finding will establish the validity of his title, although it is now conceded that a fact, material in the

chain of his title, is to be made out, if at all, by inference and deduction from circumstantial testimony. If the facts proved really warranted the inference of the administrator's assent to the legacy, there is nothing in the refusal of the court to grant the instruction prayed for, which would have prejudiced his argument to the jury in support of such inference. Nor are we at liberty to presume, from the rejection of the prayer which was submitted, that the court would have refused to instruct the jury, that the evidence in the cause was legally sufficient as a foundation for such inference of assent. It is therefore submitted, that the prayer was essentially defective in form and substance, that it could not have been granted without an invasion of the province of the jury, and that its rejection was not productive of any legal prejudice to the defendant's case.

The defect in the argument filed by the appellant's counsel consists in his erroneously assuming that the case is now open upon the facts, unprejudiced by the specific prayer upon those facts, which was made in the court below, and from the rejection of which prayer this appeal is taken. Hence he argues, that the assent of the administrator to the bequest in favor of *Mrs. Watts* ought to be presumed, because there is evidence from which the jury might have presumed such assent to have been given; that the plaintiff had no right to recover, because the assent of the administrator to the bequest being assumed, the remainder would vest in the children; and that the plaintiff's remedy is barred, because there is evidence from which a jury might have presumed the defendant and *Mrs. Watts* had held the negro adversely for more than three years prior to the commencement of this suit. It is assumed that the prayer is a general prayer, and that any argument may be used which tends to show that the plaintiff, upon the facts, was not entitled to recover. But if this view was correct, the whole argument would be avoided, because this court cannot entertain an appeal from the refusal of the court below to grant a general prayer. The defendant is therefore obliged to concede that it is a specific prayer, and that the point arising on this spe-

cific prayer, is somewhat narrower than the point which might have been raised on a general prayer, prior to the act of 1825, ch. 117. We refer to the case of *Grahame vs. Harris*, 5 *Gill and John.* 491, to show that the point, and the only point presented by this prayer, is, *that if the facts in evidence are believed to be true, the negro in question was the property of the defendant.* This is the very point in controversy, and no argument is admissible which does not tend to prove the defendant's right of property. We are thus supplied with brief answers to all these arguments. To the first, without enlarging the arguments already used, we say, that the question of presumptive assent is not made by the prayer. To the second we answer, that the point made is, that the property was in defendant, not that it was in a stranger; and the argument now submitted in favor of the right of the children, if it is worth any thing at all, most conclusively proves that the court below did right in refusing to instruct the jury that the right of property in the negro was in the defendant. To the last we answer, that length of possession cannot be set up, under the general issue, as evidence of title in the defendant as against the rightful owner. Trover is within the letter of the act of 1715, ch. 23, and the act must be specially pleaded if the defendant intends to rely upon his possession as a bar to the plaintiff's remedy. So thought the pleaders in this case.

Believing that the form of the prayer is an answer to all the arguments which have been derived from the special circumstances of the case, I shall not fatigue the court by a review of those circumstances. It will be sufficient to say, that the court's rejection of the prayer, which is to be found in the record, could not have prejudiced the defendant's case in the minds of the jury, and for aught that appears to the contrary, all the topics which are to be found in the argument of his counsel, may have been urged upon the consideration of the jury. The verdict shows the argument was unsuccessful; and we cannot impeach that verdict as an incorrect conclusion of fact from the testimony in the cause. If the weight of the testimony spread upon the record should appear to us to have

been on the side of the defendant, we should remember that the record does not necessarily disclose all the evidence which was addued at the trial. It is the usual practice, upon an exception taken to the court's opinion, expressed in a special prayer, to state so much only of the testimony as may appear material to that question. At a subsequent stage of the cause, other evidence may be introduced to change the aspect of the case, and remove the objections which are apparent upon the facts stated in the preceding bill of exceptions, although not waived by the prayer. Having no other knowledge of the facts in this case than is supplied by the record, I cannot say what was the condition of the case when it was sent to the jury. But I cannot persuade myself that this court, upon a state of facts which their knowledge of the course of practice assures them may be partial, will impute to a party a fraudulent intent or a design to enforce an unjust demand in opposition to a verdict in his favor founded upon all the evidence in the cause.

For all these reasons it is respectfully submitted that the judgment ought to be affirmed.

ARCHER, J., delivered the opinion of this court.

The question which we presume was intended to be raised by the prayer in this case, which was refused by the court, was, whether the bequest in the will of *Henry Watts,* of the exclusive use of negro *Sarah* to *Ann Watts* until the youngest of his grand-children named in the will arrived at age, gave the right to *Mrs. Watts* of the issue of *Sarah,* born during the existence of her usufructuary interest, and before the youngest of his grand-children arrived at age. If this had been the bequest of the use during the life of the legatee *Mrs. Watts,* it would not admit of discussion. Various decisions of the courts of this State have settled the question that, the bequest for life of the use of a female slave, vests in such legatee a property in the issue born during the existence of the life estate, upon the principle that, the issue is to be considered not as an

accessary, but as a part of the use, to go to the person to whom the use is limited. 6 *Harr. & John.* 18.

In the first decision which was made upon this subject in our courts, the right to the issue was placed upon the ground that the legatee, who was entitled to the profits from the use, was subjected to loss, by the pregnancy of the subject of the bequest, and from the maintenance and support of the issue, which he was bound to take care of, and that when the use is given, a bounty at all events is intended; but instead of a benefit, if the issue should go over, there might be a loss.

It has been conceded, indeed it could not be disputed, that in the case of a bequest of a female slave for a term of years, the same principle would give the property of the issue born during the term to the legatee, but it is supposed that the rule, when established by our courts, was a departure from the law, and that it should be treated as an exception, and that as subsequent cases occur, they should be decided by what is supposed to be the law infringed by the exception, and not by the exception, unless clearly within it. The error of this argument, we suppose, is to be found in the assertion, that this constitutes an exception. On the contrary, we suppose it to be the establishment of a principle, which is to govern like cases when they are presented.

The evils anticipated to flow from this doctrine, if realized, it must be admitted, would be attended with mischief and inconvenience. It is supposed that it would follow as a consequence, that he who hired a female slave for a year, a month, or a day, would be entitled to the issue born during the period of service; nay, that the hirer of a free woman, or the master of a female apprentice, would be entitled to the issue born during the service. But these consequences we think could not flow from the decision; for the instances put must be governed by the universal usage and understanding of the country, which forbid the idea, that any property in the issue could be acquired under such circumstances; besides, the contract of hiring, carries but the labor and service, and passes no property in the slave hired.

There is nothing we think in the will of *Henry Watts* which militates against the right of *Mrs. Watts* to the issue born during the existence of her estate. As applicable to the disposition of personal property in this will, the word *"use"* occurs three times, and it is true that, in the two first instances in which it is used, it carries but the right to the service and labor of the slaves. But where it first occurs, it is to be remarked, that the testator seems to have been aware that, by the use of the term, the right to the issue would be carried to the legatee for life; and, therefore, he bequeaths over the increase. And where it in the second place occurs, it is connected with the word hire—*"hire or use;"*—the term *use* being there qualified by its connexion with the word *"hire;"* as if the testator had been apprised, that without the word *"hire,"* and by the word *"use,"* standing alone, the issue of the slaves bequeathed to the grand-children might have been sold as profits, from the use, for the maintenance and education of his grand-children, which clearly was not his design; the hire or use being only appropriated to these objects. But when the testator uses the word *"use"* in the third instance, which is in the bequest now under consideration, the word *"hire"* is not connected with *"use"* as immediately preceding in the same clause, nor is the increase given over, as in the first instance; but this strong language is used.—*"It is however my desire that their mother, Ann Watts, shall have the exclusive use of negro Sarah until the youngest of my said grand-children shall arrive at age."* The will, therefore, instead of indicating an intention against the pretensions of *Mrs. Watts,* is strongly in favor of them.

The prayer of the defendant was, that the plaintiff, if the jury believed the facts, was not entitled to recover, because negro *Mary,* the property in dispute, was the property of the defendant. This direction the court refused to give. Could the court have rightfully granted this prayer, if they had believed with the defendant, that negro *Mary* passed under the will to *Mrs. Watts?* We think they could not. They would, by so doing, have taken from the jury the consideration of the ques-

tion, whether the legacy to *Mrs. Watts* had ever been assented to by the representative of *H. Watts.*—A fact indispensably necessary to have perfected the defendant's title. This is conceded so far as the mother of the child in controversy is concerned, and must be equally true as to the issue; for, as property could not be acquired in the female slave, it would seem to follow of consequence that she could be entitled to none of the fruits of that property without such assent. But it is supposed, that the presumption from the facts and circumstances was so strong, that they ought to be considered as conclusive. But this would convert what would appear from the evidence to be a presumption of fact, into a legal presumption, which we think we should not be at liberty to do. The jury might find, as an inference from the facts, that the assent was given, but they were not bound to do so. We therefore think that the court committed no error in refusing the prayer offered by the defendant, and affirm their judgment.

JUDGMENT AFFIRMED.