1823.

Hamilton
vs.
Cragg

DECREE REVERSED, &c.

June.

R T, by her will, bequeathed to S T five negroes by name, during her natural life, them and their increase, and that after the death of S T, the above named negroes be free—*Held*, that the words "the above named negroes," were intended to be used as words of description, and apply to all who were the subject of the bequest the issue as well as their mothers.

An infant slave, "*unable to gain a sufficient maintenance and livelihood*," cannot be manumitted under the act of 1796, ch 67.

## HAMILTON vs. CRAGG.

APPEAL from a judgment rendered in *Prince-George's* county court, for the petitioner in that court, (the appellee,) on his petition for freedom. The facts are sufficiently stated in the opinion given by this court.

The cause was argued before BUCHANAN, EARLE, MARTIN, DORSEY, and STEPHEN, J.

*Magruder*, for the appellant, referred to the act of 1809, ch. 171. *Somerville vs. Johnson*, 1 *Harr. & M'Hen.* 352. *Standiford vs. Amos*, 1 *Harr. & Johns.* 526; and the act of 1796, ch. 67, s. 13.

*R. Johnson* and *J. Forrest*, for the appellee, also referred to the act of 1809, ch. 171.

The opinion of the court was delivered by

BUCHANAN, J. *Rachel Turner* made her will on the 22d of February in the year 1801, in which there is this bequest: "*Item.* I give and bequeath unto my loving sister *Sarah Turner*, five negroes, by name, *Frank, Joe, Zille, Mill* and *Lin*, to possess and enjoy during her natural life, them and their increase, and my will is, that after my said sister's death, the above named negroes be free." *Rachel Turner* died soon after the execution of her will, which

1823.
Hamilton
vs
Cragg

was admitted to probat on the 5th of April 1808. *Sarah Turner*, the legatee, died in the year 1807, having previously, on the 24th of May 1804, executed her will, which was admitted to probat on the 4th February 1808, and in which, after a small bequest to *Elizabeth Beck*, she bequeathed "all her property" to *Andrew Hamilton*, the appellant, who under that will claims title to *James Cragg*, the petitioner. It is admitted that *James Cragg* is the son of *Mill*, one of the negro women bequeathed by *Rachel Turner* to *Sarah Turner*, and that he was born in the year 1805 or 1806, after the death of *Rachel Turner*, and in the life-time of *Sarah Turner*; and we are called upon to determine whether, under the will of *Rachel Turner*, he is entitled to his freedom?

The first question submitted, arises on the words of the latter part of the bequest to *Sarah Turner*, "my will is, that after my said sister's death the above named negroes be free." If the words "the above named negroes" were used in reference to those only who were before called and described by name, the petitioner, *(James Cragg,)* not being named nor *in esse*, could derive no title to his freedom by force of the terms used, but followed the condition of his mother at the time of his birth, who, though to become free, on the death of *Sarah Turner*, the legatee, was, during her life-time, not in the capacity of a servant, but in the state and condition of a slave; she had no civil rights, and could have pursued no legal remedy against her mistress on any account; she could have made no will, and was incapable of taking either by purchase or descent; the product of her labour belonged to her mistress; she could neither plead nor be impleaded, and was subject to all the disabilities and incapacities incident to a state of slavery; she was a mere chattel, the property of her mistress, who could have sold or transferred her at pleasure. Her becoming free, depended on the contingency of her surviving *Sarah Turner*, and if she had died before *Sarah Turner*, she would have died a slave, and could have had no heirs, and no civil right could have been claimed under her, founded on the relation of blood—when in that state of slavery, the petitioner was born, and though, on the death of *Sarah Turner*, in 1807, his mother became free, yet she may be said then first to have been "born into civil life," and her new born capacities, incident to her new state of

being, could not have a retrospect to the time of his birth, to the effect of giving him civil rights with which he was not born; but he became the slave of *Sarah Turner*, under the authority of the cases of *Scott vs. Dobson*, and *Somerville vs. Johnson*, 1 *Harr. & M·Hen.* 160 and 352, and *Standiford vs. Amos*, 1 *Harr. & Johns.* 526; by which it is settled, that where a negro woman, bequeathed to one for the life of the legatee, has issue during his life, and after the death of the testator, such issue shall belong to the legatee, on the ground, that the issue is to be considered not as an accessary but as a part of the use, and to go to the person to whom the use is limited. But the will of *Rachel Turner* is not to be so construed. There is no limitation over of the issue of the women bequeathed to *Sarah Turner*, to whom the testatrix meant to give freedom after the death of the legatee, as well as to their mothers; and the words "the above named negroes," were intended to be used as words of description, not to be restricted to those who were before mentioned by name, but must be understood as applying to all who were the subject of the bequest, the issue as well as their mothers. They were all placed in the same state and condition during the life of *Sarah Turner*, and no difference in their conditions, after her death, was intended, but all were equally the objects of the benevolence of the textatrix; and the issue, as well as their mothers, were entitled to their freedom on the death of *Sarah Turner*, the legatee for life, if they were in a predicament to receive it. But by the 13th *sec.* of the act of 1796, *ch.* 67, it is enacted, "that all persons capable in law to make a valid will and testament, may grant freedom to, and effect the manumission of any slave or slaves belonging to such person or persons, by his, her or their last will and testament; and such manumission of any slave or slaves may be made to take effect at the death of the testator or testators, or at such other period as may be limited in such last will and testament; provided always, that no manumission hereafter to be made by last will and testament, shall be effectual to give freedom to any slave or slaves, if the same shall be to the prejudice of creditors, nor unless the said slave or slaves shall be under the age of forty-five years, and *able to work and gain a sufficient maintenance and livelihood* at the time the freedom given shall commence." The petitioner, *James Cragg*, was born in the

year 1805 or 1806, and *Sarah Turner*, the legatee for life, died in the year 1807, so that he could not have been more than two years old at the time of her death, and consequently was not, in the language of the law, able to work and *gain a sufficient maintenance* and *livelihood* at the time that the freedom intended to be given, was to commence; therefore, though he was within one of the provisions of the act, that is, under the age of forty-five years, yet not having the other requisite, "the *ability* to *work* and *gain* a sufficient *maintenance and livelihood*," the next question is, was he in a predicament to receive his freedom, or to take any benefit under the will? The policy and object of the law is to prevent those, who by reason of their tender years, or of decrepitude, old age, or fixed and permanent disease, are unable to maintain themselves, from being cast by emancipation, as a burden upon the community, or thrown into a state of suffering and of want. The law makes no distinction in favour of infants, and did not intend to rest upon the ties or obligation of natural affection, nor on the ability of mothers to protect and support their issue; they might themselves be slaves, or dead, or might die before the period appointed for the freedom to commence, leaving their issue too young to take care of themselves; or if free and living, they might want both the inclination and ability to support and maintain them. But it looks, in relation to all, to the age and personal ability to *work* and *maintain* themselves, of the individuals intended to be set free, and to no adventitious circumstances. On that principle, the case of *Negro Anna* against *Woodburn Adm'r. of Burroughs*, a petition for freedom, was decided by this court at June 1817. There, *Leonard Burroughs* by his will, bequeathed her freedom to his negro woman *Anna*, the petitioner, who was above the age of forty-five at the time of the testator's death; and besides other property, he bequeathed to her also her son as a labourer. It was urged in support of her claim to freedom, that although she was above the age of forty-five years, yet the property bequeathed to her by the testator was sufficient for her maintenance, and therefore that the spirit and the policy of the law were gratified. But it was determined that she acquired no right to freedom under her master's will, on the ground, that by the act of assembly, from which alone the power to manumit slaves by last

will and testament is derived, no slave could be set free,
who was not both under the age of forty-five years, and
able to work and gain a sufficient maintenance and liveli-
hood at the time that the freedom was intended to com-
mence; and the circumstance that property was bequeath-
ed to her, adequate, as was alleged, to her support, was
not deemed sufficient to give effect to the manumission,
contrary to the plain and unequivocal expressions of the
act. In this case the petitioner was indeed under the age
of forty-five years, but being unable to work and maintain
himself at the time of *Sarah Turner's* death, the event on
which he was to become free, we are constrained to say
that the will was ineffectual to confer upon him his free-
dom, and that the judgment must be reversed.

JUDGMENT REVERSED*(a)*.

*(a)* We subjoin the following case of NEGRO JACK *vs.* HOPE-
WELL, in the general court at *May term* 1781, on an *appeal* from
*Saint Mary's* county court, *as applicable* to the preceding case.
The appellant preferred his petition to the county court, claim-
ing his freedom under the will of *William Cole,* dated the 7th of
February, 1732, wherein, amongst others, is this bequest: "I give
and bequeath unto my dear beloved wife, *Elizabeth Cole,* all my
negroes, viz. *Sam, Moll, Tom, Sarah, Job,* and *their increase,*
during her *natural life;* and also my moveable estate for ever; and
after her decease, I leave all my *above negroes* free and for them-
selves; and also my lands, after her death, I leave to be equally
divided amongst them." It was admitted, that negroes *Nan* and
*Frank* or *Frances,* two petitioners for freedom in another case,
were the children of negro *Moll,* named in said will and bequest,
and that they were born in the life-time of *Elizabeth Cole,* the
devisee in said will, and after the death of the testator, and that
*Elizabeth* survived the testator; and that negro *Jack,* the peti-
tioner in this case, was the descendant of said negro *Nan* or
*Frank,* and had been held in slavery from the time of his birth.
The defendant in the county court, (the present appellee,) pro-
duced to the court a transcript of an instrument of writing, taken
from the records of *Saint-Mary's* county, executed by the said
*William Cole* on the 2d of November, 1732, whereby, for great
love and affection which he bore to his wife *Elizabeth,* he gave to
his said wife the following negroes, viz. *Sam, Moll, Tom* and
*Sarah,* and all other his goods and chattels he had, might or
ought to have; to have to the said *Elizabeth,* her heirs and as-
signs for ever, and had and did deliver the negro woman, named
*Moll,* in the name of the whole. This instrument of writing ap-
peared to have been executed, and the said negro delivered in
pursuance of it, in the presence of two witnesses. It was re-
corded on the 16th of November, 1732. The county court gave
judgment against the petitioner, who prosecuted this appeal.

*J T. Chase,* for the appellant, contended, that all the descen-
dants of the negroes, mentioned in *William Cole's* will, became
entitled to their freedom on Mrs. *Cole's* death. This was obvious-
ly the testator's intention, for in every part of the will he places
the issue on precisely the same footing with those who are ex-
pressly named, respecting whose right to be free no question had
been or could be raised. To show how intimately and indissolu-

## Tongue vs. Morton.

APPEAL from the Court of Chancery. The case is accurately stated by the appellant's counsel in his argument, made at this term before BUCHANAN, EARLE, MARTIN, and DORSEY, J.

*Magruder*, for the appellant. The facts in this case are, that *John Westeneys*, on the 29th August 1786, executed a will, in which he directed all his estate, real or personal, to be sold by his executors, and after paying his debts and funeral charges, that there should be remitted to Messrs. *Eliza* and *Mary Steries*, & Co. of *Edinburgh*, £260 st'g. After some trifling legacies, the remaining part of the pro-

bly they are connected, it is only necessary to read the bequest. The testator gives negro "*Sam, Moll*, &c. and *their increase*, to his wife during her natural life, and after their decease, leaves all his negroes free and for themselves" Now this language is equally applicable to the increase, as to those who are specified. It is impossible to refer any part of it to one, without also referring it to the other. The counsel for the appellee may contend, that it was not intended to manumit the increase, because, by the bequest, the only persons whom the testator wished to be free, were such as could take the land devised in the latter clause of the will, and that the increase, not being *in esse* at the time of making the will, were incapable of taking under that devise. This, however, is not a correct doctrine; for it is well established, that either real or personal property may be left to persons not *in esse*, and who, when born, may receive the benefit of it as fully as if they had been in existence at the death of the devisor. In support of this position, he referred to 2 *Vern* 705. 1 *Eq. Ca. Ab.* 203. 2 *Eq. Ca. Ab.* 290, pl. 2 *Vin. Ab.* tit. *Devise*, 86, pl. 6. Since the testator has expressly said that the *increase* shall be free, all those doubts, which might otherwise have arisen, are removed, for it will hardly be contended that the increase could not be *disposed* of because they were *in esse* when the testator died. Lest, however, such an opinion should be advanced, he said he would show to the court, from the highest authority, that it was erroneous; he accordingly cited the following passage from *Swinburne*, 186. "not only that thing may be devised which is truly extant, or hath an apparent being at the making the will, or at the death of the testator, but *that* thing also which is *not* in *rerum natura* while the testator liveth, as the corn which shall be sown or grow in such a soil after his death, or the *Lambs which shall come of his flock of Sheep next year.*" Nor (he said,) does any doubt exist respecting the power which every man possesses to give by will a life estate in a personal chattel, with a remainder over. He referred to 2 *Eq. Ca. Ab.* 319. 2 *Freem.* 206. *Ca. in Ch.* 280. 1 *P. Wms.* 534, 535. He also cited *P. Wms.* 340, 342. 1 *Atk.* 410, 412, 435. *Pr. in Chan.* 470.

*T. Stone*, for the appellee.

THE GENERAL COURT *reversed* the judgment of the County Court. The appellee appealed to the Court of Appeals, and, at May Term, 1784, the judgment of reversal was affirmed in the Court of Appeals.