## Wm. H. Chelton *vs.* Robert Henderson and wife's Lessee.—*December* 1850.

A testator by his will, executed in 1788, devised as follows: " I give and bequeath to my son, *I. D.,* the *use* of the plantation whereon I now live, to him, the said *I. D.,* *during his natural life,* and if it should please God that the said *I. D.* should have *issue* born of his body lawfully begotten, then such *issue* after the death of the said *I. D.,* to have the aforesaid devised premises in fee tail, but if the said *I. D.* should die without *issue* of his body lawfully begotten," then over to his son *T. D.,* in fee simple. Held: That under this devise, *I. D.* took only a life estate, and not an estate tail general, and that the rule in *Shelley's case* does not apply.

This rule is not an imperious rule of law which must control the operation of a will, no matter how clearly a contrary intention may be expressed upon its face, but it is a rule of construction that must prevail, except in cases where a contrary intention satisfactorily appears by the will itself.

It was established in *England* as a convenient and necessary rule of construction, by which the intention of the testator was to be effectuated, not defeated.

Even if in such a case in *England,* the technical import of the word " heirs" should be regarded as conclusive evidence of the intent of the testator, that the rule should operate and countervail all other expressions in the will indicating a contrary intent, yet it does not follow that the same principle must govern a case where the word " heirs," is not used.

The word "issue," is a term of equivocal import, being either a word of limitation or of purchase, according to the intent of the testator, deduced from the expressions contained in the will.

In *England.* every inference is in favor of the rights of primogeniture, and all presumptions are in favor of the acquisition of title to land, by descent rather than by purchase.

In *England,* the word " issue," when used in a will, is construed a word of limitation and not of purchase, unless the intent of the testator to use it as a word of purchase, is so conclusively shown by other expressions, as to repel such an interpretation.

In this State, since the act of 1786, no partialities or presumptions in favor of primogeniture or heirs at law, can, as applicable to a case like the present, be said to exist.

The right of testamentary disposition, where the intent of the testator satisfactorily appears, is to be favored and fully effectuated, unless in contravention of some established principle of law, over which the intent of the testator can exert no control.

Courts of justice will be astute in discovering the real intent of the testator, and the means by which that intent is to be carried into effect.

The act of 1786, ch. 45, abolished the right of primogeniture, and made all estates tail general thereafter acquired, to descend as fee-simple estates; and by the act of 1782, ch. 23, an estate in fee-tail may be conveyed in the same manner as an estate in fee simple.

The clear intent of the testator in this will, was that his son, *I. D.*, should enjoy the plantation during his life, and if he should have "issue," such "issue," after his death, should have the land in fee-tail.

The rule in *Shelley's case,* has, in this State, in a case like this, no principle of reason, expediency or policy to sustain it, and it would wholly defeat the clearly expressed intent of the testator.

This court cannot assent to the doctrine that the rule in *Shelley's case,* must be applied without reference to testamentary intention, as applying to cases since the act of 1786, ch. 45. That rule is not applicable to a case like this.

In construing wills since the passage of the act of 1782 and 1786, we must look not merely to the law as it prevails in *England,* but to its altered condition in this State since the passage of those acts.

APPEAL from *Somerset* county court.

*Isaac Dixon* died in July 1788, leaving a last will duly executed, to pass real estate, on the 9th of May, 1788, in which, after giving to his wife a life estate in one-third of the plantation on which he resided, devised as follows:

"2nd. I give and bequeath to my son *Isaac Dixon,* the use of the said plantation whereon I now live, (except the third part already disposed of,) to him, the said *Isaac,* during his natural life, and if it should please God that the said *Isaac* should have issue born of his body, lawfully begotten, then such issue, after the death of the said *Isaac,* to have the aforesaid devised premises in fee-tail, but if the said *Isaac* should die without issue of his body lawfully begotten, it is my will and desire that the above mentioned lands and premises, with all other rights and claims in my lands whatsoever, shall descend to my son *Thomas Dixon,* and his heirs in fee-simple."

*Isaac Dixon,* the devisee in the will, entered upon the lands after the death of the testator, and in 1796, married and had issue, an only child, *Isaac Dixon, Jr.,* and on the 10th of June, 1822, executed a deed conveying the lands in question to his said son, *Isaac Dixon, Jr.,* "during his natural life," "and after the decease of the said *Isaac Dixon, Jr.,*" to his

grandson, *William Thomas Dixon*, son of the said *Isaac Dixon, Jr.*, "his heirs and assigns forever," and died in August, 1823.

*William Thomas Dixon*, the grantee in remainder in said deed, died in 1828, intestate and without issue, leaving a sister *Margaret*, the wife of *Robert Henderson*, the appellee, his only heir at law.  *Thomas Dixon*, the son of the testator, and devisee in remainder in the will, survived his father, and was unmarried and without children at the death of the testator.

In July 1823, one *Samuel Tull* recovered judgment against *Isaac Dixon, Jr.*, the grantee for life in the deed of the 10th of June, 1822, upon which judgment a *fi. fa.*, was issued and the lands in question were levied upon and sold at sheriff's sale on the 8th of April, 1824, being then in possession of the said *Isaac Dixon, Jr.*, to one *William Roach.* The lands were afterwards conveyed by *Roach* to one *Henry Lankford;* and by him to *Fleet Chelton*, who leased them to the appellant.

In November 1847, *Robert Henderson* and *Margaret* his wife, the latter being the only heir at law of *William Thomas Dixon*, the grantee in remainder in the deed of the 10th of June, 1822, brought their action of ejectment to recover these lands, and at the trial, the above facts having been admitted, the plaintiffs prayed the court to instruct the jury that by the true construction of the said will of *Isaac Dixon*, the testator, *Isaac Dixon*, the son of the said testator named in said will, took an estate-tail general in the plantation mentioned in the said will, which instruction the court, (Tingle, A. J.,) granted, and the verdict and judgment being for the plaintiffs, the defendant appealed.

The cause was argued before Dorsey, C. J., Spence, Magruder, Martin and Frick, J.

By Waters and Crisfield, for the appellant, and
By Done and Wm. W. Handy, for the appellees.

DORSEY, J. delivered the opinion of this court.

A statement of but few facts being necessary to explain the the nature and origin of the controversy in this case, a brief enumeration of them, so far as it may be necessary for that purpose, would perhaps greatly facilitate the comprehension of the opinion, we may express upon the subject. *Isaac Dixon* the testator, being seized in fee of the lands in question by his will dated the 9th of May 1788, and admitted to probate on the 15th day of July of the same year, devised the lands in question to his son *Isaac Dixon* (who shall be denominated as "*Isaac Dixon* the second") "during his natural life, and if it should please God that the said *Isaac* should have issue born of his body lawfully begotten, then such issue after the death of the said *Isaac,* to have the aforesaid devised premises in fee-tail, but if said *Isaac* should die without issue of his body lawfully begotten, it is my will and desire that the above mentioned lands and premises, with all other rights and claims in my lands, shall descend to my son *Thomas Dixon* and his heirs in fee-simple." Under this devise *Isaac Dixon* the second, entered and was seized of the premises, and by a deed in due form of law, on the tenth of June 1822, conveyed the same as far as he was competent to do so, to his son *Isaac Dixon, Jr.,* (who for distinction sake shall be called *Isaac Dixon* the third) and after his decease to *William Thomas Dixon,* the son of *Isaac Dixon* the third, his heirs and assigns forever. *Isaac Dixon,* the third, having previously departed this life, *Margaret Henderson,* the heir at law of *William Thomson Dixon,* and *Robert Henderson* her husband, instituted the present action of ejectment. It is unnecessary to state the facts constituting the appellant's claim to the land in dispute, and under which he held possession thereof, as the right of a plaintiff in ejectment to recover, depends upon the sufficiency of his own title, not upon the insufficiency of that of his adversary.

Upon this appeal but one question presents itself for determination by this court, and that is, did the county court err in granting, as stated in the appellant's bill of exceptions, the prayer of the appellee, that under the will of *Isaac Dixon* the

testator, *Isaac Dixon,* (the second,) the devisee took an estate-tail general, in the plantation thereby devised? This case has been argued at great length, and with much ability by the counsel engaged in it, and all the adjudications upon the sub-ject both in *England* and in the *United States,* have been pre-sented to the consideration of this court. The rule in *Shelley's case,* as it is called, has been pressed upon us as an inflexible rule of law, conclusive upon the question before us, no mat-ter what may have been the intention of the testator, as dis-closed in the provisions of his will. In our opinion this rule, at least in testamentary cases, is not so to be regarded. It was established in *England* as a convenient and necessary rule of construction, by which the intention of the testator was to be effectuated, not defeated. It is not there an imperious rule of law, which must control the operation of the will, no matter how clearly a contrary intention may be expressed upon its face, but it is a rule of construction, which must prevail ex-cept in cases where a contrary intention satisfactorily appears oy the will itself. The rule as announced in *Shelley's case,* is where the limitation over is to "the heir or heirs of the body" of the tenant for life. Even if in such a case in *England,* the tech-nical import of the word "heirs" should be regarded as con-clusive evidence of the intent of the testator, that the rule should operate and countervail all other expressions in the will indicating a contrary intent, yet it by no means thence follows that the same principle must govern the case now under consideration, where the word "heirs" has not been used. According to all the decisions in *England* and in the *United States,* "issue," which is in the will before us is a term of equivocal import, being either a word of limitation or of purchase, meaning heirs of the body or children, according to the intention of the testator deduced from the expressions con-tained in his will. How in the present case the testator in-tended that the word "issue" should operate, we think there is no room for any reasonable doubt. Whether according to the principles of law and rules of construction prevailing in *England,* as established by the numerous decisions there

made upon such subjects an *estate-tail in* the devisee would be created or not, we deem it unnecessary to inquire. In *England* every inference and implication is in favor of the rights of primogeniture. All presumptions are raised in favor of the acquisition of title to land by descent rather than by purchase. And in accordance with such presumptions and in futherance of that mode of acquiring or passing title, is the intention of a testator assumed to have been. For these and other reasons for the most part inapplicable to devises of land in *Maryland,* since the passage of our act of descents, the word "issue," when used there in a will, has been construed, a word of limitation and not of purchase, unless the intention of the testator to use it as a word of purchase, *descriptio personarum,* is so clearly shown by other expressions in the will as conclusively to repel such an interpretation. In the *State of Maryland,* since the act of 1786, no such partialities or presumptions in favor of the rights of primogeniture or heirs at law, can as applicable to cases like the present, be said to exist.

The right of testamentary disposition where the intention of the testator satisfactorily appears is to be favored, and fully effectuated, unless its exercise be attempted in contravention of some established principle of law, over which the intention of the testator can exert no control. The testamentary will and intention, are restricted by no other principle of law, or governmental policy. On the contrary, courts of justice will be astute as well in discovering the real intention of the testator, and the means by which that intention is to be carried into effect, as in securing to the objects of the testator's affection and bounty, the enjoyment of the property devised in the mode, and for the time that it is given, as far as is consistent with those principles which have been established as the great landmarks controlling such dispositions of property.

By our act of descents passed in December session 1786, ch. 45, and to commence its operation on the 1st of January 1788, the right of primogeniture was abolished, and all estates "in fee-tail to the heirs of the body generally created or acquired after the commencement of this act," of which the owner should

die intestate, were made to descend to his heirs as if they were fee-simple estates.

By the act of 1782, ch. 23, an estate in fee-tail may be conveyed in the same manner that an estate in fee-simple can.

Applying these preliminary statements and remarks to the will before us, and adverting to the times and circumstances of its execution and the nature of the provisions, it may fairly be presumed that the testator understood the nature and effects of an estate tail, and the obvious effect upon it, wrought by the two acts of Assembly, which have been referred to. Under such circumstances, to what conclusion must every intelligent man as well as lawyer arrive, as to the testator's intention in inserting in his will the clause, we are now called on to interpret? It must be that the testator designed that *Isaac Dixon* the second, (the devisee) should enjoy the plantation in dispute during his natural life, and that if he should have "issue," such "issue," after the death of the devise should have the devised premises in fee-tail. Such in effect are the very words of the testator. His intention then being manifest and being distinctly and fully disclosed by the expressions of the will, what is the obvious duty of the court? To impose on the will such a construction as accords with and will effectuate such intention, and not to apply to it a technical rule of construction, which at present, in *Maryland*, has in a case like this no principle of reason, expediency or policy, to sustain it, and the undeniable effect of which is wholly to defeat every portion of the clearly expressed intent of the testator. By the explicit terms of the will the interest of the devisee in the devised premises was to continue but during his natural life, and it is not unworthy of notice that the devise does not purport to give to him even for that period the plantation itself, but "the use" of it. Thus confining the devisee, as the testator supposed, to a mere usufructuary interest for life. Why was this restricted, guarded mode of expression, resorted to? There could have been but one reason for it. It was manifestly designed to show the limited character of the life estate conferred on the devisee, and to repel every implication of his taking such an estate as would de-

stroy or enable him to destroy the limitations over to his issue and contingently to his brother *Thomas.* That it was the intention of the testator deducible from the language of the will, to give to the devisee, *Isaac Dixon* the second, an estate-tail, has not been and could not be with any semblance of rationality contended for in the argument before us. But it is said that the indication or existence of such intention is immaterial, that the application of the rule in *Shelley's case* must be made without reference to testamentary intention. To this doctrine thus broadly asserted, as applying to cases in *Maryland* since January 1788, we never can subscribe our assent, and we utterly deny the applicability of the rule in *Shelley's case* to such a case as that now before us, where the clear and unequivocal expressions of the will demonstrate that the intention of the testator was in direct conflict with that ascribed to him by the application of the rule in *Shelley's case.*

As an authority to sustain the position we have assumed that in construing the will before us, we must look not merely to the law as it prevails in *England,* but to its altered condition in *Maryland* since the passage of our acts of Assembly of 1782 and 1786, we would refer to the case of *Smith and wife vs. Chapman* and others, 1 *Hen. and Munf.,* 240, where it was held that "in construing wills made since the acts of Assembly of 1776 and 1785, on the subjects of estates-tail, it seems that the courts in this country will not by implication turn an express estate for life, with limitations over in remainder into a fee-tail, (as in like cases in *England,*) because although it is done there to effectuate the general intention of the testator, such a construction under the operation of our laws would defeat that intention."

Dissenting from the county court in its granting of the prayer of the appellees as stated in the appellant's bill of exceptions, its judgment is reversed, but no procedendo awarded.

JUDGMENT REVERSED,