# William Holmes *vs.* Walter Mitchell, Sarah Floyd, and others.

A testator devised real and personal estate, the latter consisting in part of negroes, to a trustee in trust, "the income arising therefrom to be applied to the mutual benefit" of the uncle and aunt of the testator during their joint lives, and after the death of the uncle "to the mutual benefit" of the aunt "and her children," and after the death of the aunt "to the use and benefit" of her children, until the youngest attains the age of twenty-one, then the said real estate, "together with the rest of the property so as aforesaid left in trust, to the children" of his said aunt, "to them and their heirs, forever, share and share alike."   The decree of the chancellor, deciding that the increase of the female slaves born during the life of the aunt constituted a part of the trust estate, and passed to those entitled in remainder, was, upon appeal, *affirmed* by a divided court.

Appeal from the Court of Chancery.

This appeal was taken from a decree of the chancellor dismissing the bill of the appellant, the complainant below. The facts of the case are fully stated in the opinions of this court, and also in the opinion of the chancellor, reported in the case of *Holmes vs. Mitchell,* in 4 *Md. Ch. Decisions.*

The cause was argued before LE GRAND, C. J., ECCLE-STON, MASON and TUCK, J.

*Frederick Stone* and *Cornelius McLean* for the appellant. The only question in this case is, whether the increase of the female slaves go to the tenant for life or to those in remainder? The intervention of a trustee can make no difference in the construction of this will, for the words creating the trust are technical, and must be taken in their legal and technical sense, and the construction of a legal estate and a trust estate are the same where the terms used are the same. *Lewin on Trusts,* 24 *Law Lib.,* 42. We must then in this case inquire whether the terms used would, in a devise of a legal estate, pass the increase of the negroes? It is well settled that the devise of a female negro slave for life, with remainder over, will give the increase to the tenant for life, unless the intention to the contrary *be clear.* 9 *G. & J.,* 77, *Hope vs. Hutchins.* 6 *H. & J.,* 16, *Hamilton vs. Cragg. Ibid.,* 526, *Chew vs. Gary.* The word "use" will give the increase to the legatee for life. 10 *G. & J.,* 458, *Sutton vs. Crain.* Here the word is "*income,*" and it is certainly not less extensive than "*profits,*" which, in the case of *Hope vs. Hutchins,* was held to include the increase of slaves. The tenant for life has to maintain the increase,—his means are expended for their sustenance and nurture,—he loses the loss of the service of the mother during pregnancy. There must be express words or necessary implication to carry the increase over. 6 *G. & J.,* 171, *Evans vs. Iglehart.* Here the words of limitation over are, "together with the rest of the property so as aforesaid, left in trust." This does not include the increase of the negroes. It will be necessary for this court to decide that they are *accessories* before they can pass, but it has been decided that they are not only not accessories, but are *profits.* 10 *G. & J.,* 458, *Sutton vs. Crain.* 5 *Gill,* 51, *Worthington and Hicks, vs. McPherson.* A general gift of the "income," arising from personal property is equivalent to the gift of the property itself, (18 *Law Lib.,* 242,) and the technical meaning of the words must,

as far as possible, be adhered to.   2 *Gill*, 238, *Mitchell vs. Mitchell.*   The argument of the chancellor, on the ground of humanity, is not applicable, because the death of the tenant for life would work in law the same separation of the infant and the mother.   But every slaveholder has this power over his slaves, and there is no reason why the slaves in this case should be placed upon a different footing in this respect from that of all others in the State.   The law of slavery was early established in this State, and the rule that the increase goes to the tenant for life was established by the usages and necessities of the people before any decisions upon the subject were made.   But it is said the remainder men may get nothing if the trust should continue for a long period, unless the increase goes to them, but every remainder man takes subject to the contingency, that the property may be used up by the devisee for life where the use of the property is its consumption.

*Robert J. Brent* for the appellees.   This is a case *sui generis.*   The trust is to be an open, continuing trust, until the youngest child shall attain the age of twenty-one.   The property is to be kept together under the possession and management of the trustee, and he is to apply the income thereof as the will directs.   I concede the general principle of law in this State is, that a direct devise of a negro slave to one for life, passes the increase to the tenant for life.   1 *H. & McH.,* 160, *Scott vs. Dobson; Ibid.,* 352, 353, *Opinion of Dulany,* and the other cases cited by the appellant fully sustain this. But this is an innovation upon the common law, (*Hill on Trustees,* 386,) and the rule ought not to be carried beyond the adjudged cases.   These cases decide, that where the tenant for life is bound to support and maintain the female slave, and is liable to lose her services by disease, the law, as a general rule, will give him the issue of such female slave, by way of compensation for any loss of service on the part of the mother, as well as for his trouble in raising the offspring. But even that rule of law was broken in upon by the decision (in manuscript) of the Court of Appeals, in the case of *Lloyd*

*und Brent, Dec. Term,* 1841. It was held in that case, that the words "hire and to farm let *for life of the grantor*," would not in a contract vest such an interest in the mother of afterborn slave issue, as would give that issue to the *hirer for life,* as against the executor of the grantor. That was a very strong case, because the *hirer for life* had all the trouble of raising the afterborn issue, and the risk of a loss of the mother's services, yet his title was defeated by the form and phraseology of the contract. Now in this case I do not see how the complainant can depend even on the general rule of law, "*partus sequitur ventrem,*" when it is considered that he had no title at law or in equity to the mothers of those afterborn issue, but a mere right to the net income from the farm and negroes, as a consolidated trust property.

If, as I presume it cannot be denied, the trust estate was bound to nourish and clothe *the infants* now claimed, and was the loser by the *sickness* of the mothers, it seems to me that the trust estate is entitled, *on general* principles, to *the issue,* and as the mothers are held in trust, so are the issue in a *trust so peculiar as this,* whatever it might be in ordinary trusts. The testator evidently contemplates that his whole property is to remain *en masse,* until the general division thereof, and as he gives no title or possession thereof to his *cestui que trusts,* but merely the *net income,* it is out of the question to give them the *issue* of the slaves as *income.* I can add nothing to the learned opinion of the chancellor in this case.

Tuck, J., delivered his opinion as follows:

In the interpretation of wills, the intention of the testator is to be gathered from the entire instrument, and prevails unless it violates some established principle of law; and where there is a general intention, and a particular minor intention, the latter must give place. It is immaterial in what part the intention is found. The words are the means to ascertain it, and, however scattered, if they explain it, they are to be collected and put together, that the will may have the effect in-

tended. It would, in many cases, prejudice the design of the testator, if courts seized upon one clause, or upon one word only, and looked no further. As subservient to indicate the intention the law requires us to consider all the words of the will, wherever they are. It is true that certain terms have received a technical meaning, and a testator will be presumed to have used them in that sense, unless the contrary appears by the will. But at last the intention must govern; and so controlling is this guide, unless it contravene some established rule of law over which it can exert no influence, that the rule in Shelley's case, though of early origin, and sanctioned by numerous cases, as of binding authority where it is applicable, does not necessarily stamp a legal meaning upon the will in all cases in which terms within the words of that rule are employed, but the intent of the testator will have effect. *Lyles vs. Digges,* 6 *H. & J.,* 364. *Ram. on Wills,* 64, 109. *Chelton vs. Henderson,* 9 *Gill,* 432. Other instances might be given, in which expressions in wills have received an interpretation different from their legal import, because such technical meaning would have frustrated the design of the testator.

Looking to the whole will in the case before the court, and giving to its terms their ordinary and plain signification, in which they were doubtless employed by Mr. Semmes, and in which sense it is our duty to apply them, (1 *H. & J.,* 422; 1 *Johns. Ch. Rep.,* 228,) it appears to me that he intended that all the property devised in trust to the appellee, together with the increase of the animate personalty, should constitute a trust estate, until the arrival at age of the youngest of Mrs. Floyd's children; the income in the meantime to be applied by the trustee as therein directed.

It is said, however, on the part of the appellant, that, conceding this to have been his design, he has used the word "income," by which the law defeats that intent; and the cases in 1 *Har. & McH.,* 160, 352; 9 *Gill and Johns.,* 77; 10 *Gill and Johns.,* 458, are relied upon to show that by force of this term the issue of the negro women, born during the lifetime of William Holmes, belong to him and Mrs. Floyd. It

is true, that on the authority of these cases, children born during a life estate, or a term, belong to the tenant of the limited estate; and the same principle was applied where the "use" or "profits" of female slaves were given or reserved. It is important, however, to consider the difference between the first two and the last two of these decisions. The Court of Appeals, in the case of *Hope vs. Hutchins*, 9 *Gill and Johns.*, 77, in which the "use of the property, and all profits arising therefrom," were held to pass a usufructuary interest in the corpus, and the profits, for life, said, that the two cases in 1 *H. & McH.* had nothing to do with the question then before the court, because in them, the property in the female slave, the mother, was vested in the tenant for life; whereas, there was nothing more reserved to Mrs. Hope than a limited and temporary right of user, which expired at her death; and that the issue as well as the corpus passed to the donee. The same principle is recognized in *Worthington vs. McPherson*, 5 *Gill*, 51, where the judge who delivered the opinion in *Sutton vs. Crain*, 10 *G. & J.*, 458, said, that the profits of the estate bequeathed to the son of the testator, belonged to him, (and not to the remainder man,) "in virtue of the vested estate that he took in the principal fund by the devise." In the cases in 9 and 10 *G. & J.*, the property in the mother did not pass to the first taker, but the increase was adjudged to pass, in the one case, as part of the profits, and in the other, as part of the use of the mother. It is manifest that this effect was not the result of any supposed legal meaning of the words employed, which nothing could control, to be applied in all cases where a party is entitled, for a limited time, to the services of a female slave. For if this were so the hirer of a negro woman would be entitled to her issue born during the period of service, not only by force of the word used, but because the case would be within the very reason assigned by Mr. Dulany in *Somerville vs. Johnson*, 1 *H. & McH.*, 352, "That the issue ought to go to the person to whom the use was limited, otherwise having no interest worth regarding he might not take care of the issue. And that it

would only be a reasonable satisfaction for the expenses of maintenance, and for the time lost by the parent." Indeed the reason of the rule applies much more strongly, in the case of hiring for a short period, because it might happen that nearly all the time of the parent would be lost to the party entitled to her labor, besides the expenses of herself and child. But the principle has never been extended to such cases, because they must be governed by the universal usage and understanding of the country, which forbid the idea that any property in the issue could be acquired under such circumstances; besides, the contract of hiring carries but the labor and service, and passes no property in the slave hired. 10 *Gill and Johns.*, 478. Here, again, we see that the idea of *property in the mother*, has much to do in determining who is entitled to the increase.

In the will in *Sutton vs. Crain*, the word "use" occurs in three clauses. In the first two it was held to pass only a right to the service and labor of the slaves. Why? Because that intent was manifest from the context. In one instance the increase was bequeathed over, and in the other it is connected with the word "hire," which qualified the meaning of the word use.

From these cases it appears that the Court of Appeals did not consider this rule of construction as applicable, without qualification or exception, to all cases where the issue or profits of the mother were given by the will. And there is no warrant by any authority before the court, for saying that these terms, *proprio vigore*, import an intent in law, that the increase shall belong to the person entitled to the use of the corpus; and that they cannot receive a different construction, according to the design of the testator as shown by other parts of the will, or in conformity with the usage of the country, as in 10 *G. & J.*

In the will under consideration another term is employed, which, it is supposed, is equivalent in law to the words use and profits. Conceding for argument's sake, that if either of these expressions had been employed by Mr. Semmes the

Holmes vs. Mitchell, et al.

issue would pass to the appellant and Mrs. Floyd, it does not follow that the word "income" must have the same effect. It does not appear that any judicial tribunal has held it to be synonymous, in law, with the issue of slaves. In the creation of trusts in regard to land, negroes, and other property in mass, as here, the application of the "rents, issues and profits," is a common form of expression, and though it is quite reasonable to suppose that during the eighty years that have elapsed since the effect, now contended for, was given to the word "use," cases have occurred in which the question might have been raised, we do not find that any suggestion has been made, that the issue, as soon as born, became separate and distinct from the trust estate, and passed absolutely to the cestui que trust, as part of the use or profits. "Though the practice does not make the law, yet it is very strong argument of it." Houlditch vs. Birch, 4 Taunt., 611.

In one case, however, in which it was used in connection with the enjoyment of a life estate in negroes and other chattels, it would seem that the court considered that there was a difference between "increase" and "income," according to the different kinds of property composing the corpus of the estate; the words, "increase and hires," being appropriately applicable to negroes and other animate personalty; "accumulations and income," to other chattels. It is true that no point was made as to the legal meaning of these expressions; but it so happens, that in several instances in which they are used, a difference as to their proper application is impliedly recognized. Evans vs. Iglehart, 6 G. & J., 190, 191.

I do not understand that it is insisted for the appellant that Semmes, by using this word, designed that the issue should pass to his uncle; but that the law gives this effect to the will, because this term was employed. It may be safely assumed, I think, that if he had intended the issue to pass to the appellant, he would not have used the word "income," as expressive of such purpose. It is not so employed generally. In common parlance it conveys no such idea. In

law it has not received that interpretation. Why should we give it a legal meaning different from its ordinary accceptation? Where words are well understood to have acquired a fixed legal definition, they must be so interpreted; but to place a meaning upon a single word not commonly so understood, merely because of a supposed or actual analogy between it and some other that has been so construed, would, in many cases, (and I think in this,) defeat the obvious intent of the testator, and allow the court to make for him a will that he would not have made for himself. When we consider the circumstances under which wills are often prepared by persons not acquainted with the force of words, as technically understood, every intendment should be made against giving such legal effect to expressions that may have been used in their common acceptation, because we thereby, more generally, succeed in arriving at the intention of the testator. It is upon this principle that "courts of justice are astute as well in discovering the real intention of the testator, and the means by which that intention is to be carried into effect, as in securing to the objects of his affection and bounty the enjoyment of the property devised, in the mode and for the time that it is given, as far as is consistent with those principles which have been established as the great land-marks controlling such dispositions of property." 9 *Gill*, 437. Technical rules, such as the one relied upon here, which are founded on no great principle of policy, and which set aside, while they profess to seek, the will of the testator, must continually be contested and often invaded. They give rise to expensive litigations and distressing family quarrels, for the very reason, that they reject the plain common sense in which the expressions of the will were employed; and it is not in human nature to submit to such a construction without contest, *Mekonkey's Appeal, S. C. Pa.,* 1 *Am. Law Reg.,* 342.

I do not think, however, that the counsel for the appellant have succeeded in bringing this case fully within the principle of the decisions on which they rely, ever assuming as they do that income, use and profits, mean the same thing.

In the first place, whether the trustee has or not "an interest worth regarding," it is his duty to take care of and provide for the issue, which it is supposed would not be the case with a tenant for life, or person entitled to the use, if the increase belonged to the remainder man. So that neither the persons entitled to the income or those in remainder can complain of any probable loss on that account, for if this duty were neglected the trustee might be removed. And in regard to the expenses of the mother and her loss of time, and the support of the infant, these are all, in the first instance, to be met by the trustee. He has no right to call on the appellant for any contribution to such objects. Legally the property is the trustee's; and the law casts upon him the obligation of providing such necessaries and comforts as are usually required in such cases. In the case of a tenant for life, where the possession and use are in the tenant, these burdens fall on him as an obligation from which he cannot escape as long as he is the owner of the property. 10 *G. & J.*, 478. But not so with the appellant. No such charge rests upon him. He is not obliged to pay one cent towards the expenses of the estate. It is true, that his share of the income may be diminished by the disbursements of the trustee for attending the mother and maintaining the increase. But this is a necessary consequence of keeping the property together for trust purposes. He might, with as much reason, claim the possession and ownership of any one of the negroes who might happen to fall sick, because his loss of time and doctor's bills had lessened the amount derived by him from the estate as income. It is not merely the loss of time and expense that give title to the increase in the cases where such claim of the tenant for life has been allowed, but it is also the obligation which the law imposes on him to take care of the mother and the issue, because being obliged to defray such expenses, the bequest might possibly prove a loss where a benefit was intended. 1 *H. & McH.*, 353. 10 *G. & J.*, 478. The *cestui que trust*, if he derives no benefit from the property, is certainly not obliged to incur any expense while it is under the management of the trustee.

But conceding that the term employed must have the same effect as if it were use or profits, the intention of the testator, as shown by the whole will, must defeat that pretension. Supposing that he had a motive for every clause it contains, we should, as far as practicable, give effect to each. He appears to have had a peculiar regard for his negroes. Some he sets free and provides for. To one he gives his watch and wearing apparel, and to another his furniture. Having relatives for whom he desires to make provision, he leaves a mass of property, land, negroes, stock, &c., in trust, for the purposes declared in the will. Why did he create a trust at all if all that he designed could have been effected by means of direct bequests? I do not say that the principle of the decisions above mentioned and relied upon by the appellant, does not, in many cases, apply as well to trust as to legal estates, but I find this trust created, and I must presume that he had a motive for using that mode of testamentary disposition. One effect of, and probable inducement to which, would be to keep the property together in the hands of a friend in whom he reposed confidence, and not to subject the infant remainder men to the hazards that might attend the management of the estate by Mr. Holmes and Mrs. Floyd. Mrs. Floyd was a *feme covert*, and this arrangement may have been deemed necessary to prevent her husband's interfering with her interest, as if it had passed by a direct devise. The effect of the construction contended for by the appellant would be to give the increase to her husband, which, I am quite sure, the testator never designed, for in that case the trust, as to her, would have been unnecessary. For some reason he chooses not to intrust them with the possession of the property at all, but makes it the duty of the trustee, according to my construction, to hold and manage the entire estate, and apply the income for their mutual benefit. He holds the legal estate, while they are entitled to the usufruct, not to be taken by them as of their own estate, but to be applied by him. Another reason for creating the trust may have been, that the negroes, whom from considerations of kindness and affec-

tion for his relatives he could not manumit, should be kept together on the estate, the increase to follow the legal title in the trustee, and not to be separated from their parents, as would have been the consequence of a direct bequest of the use to the appellant. 6 *Gill and Johns.*, 195. He nowhere shows any greater regard for Mr. Holmes than for the other devisees, as far as this property is concerned, except that he gives him one-half the income, before the others can enjoy any thing; and, as if to compensate for this, he gives them the property ultimately in fee. It is manifest that he designed that these children should take something substantial and beneficial under his will. And, yet, according to the appellant's construction, it might happen that at the termination of the trust they would have nothing but the land, with superanuated negroes, worn out implements, and little or no stock, the land itself, perhaps, greatly deteriorated by reason of insufficient means for cultivating it. This might, indeed if the life estate continued for a considerable time would be, the necessary consequence; because the same rule which would give the issue of the slaves to the appellant and Mrs. Floyd, would also give to them the increase of all the animate property. And the argument of his counsel would deny to the trustee the right of supplying, from the proceeds of the estate, what might be actually necessary for carrying on the farm, for the cost of any thing so purchased would be so much taken from the income, the whole of which is claimed by the appellant, as applicable for the benefit of himself and Mrs. Floyd. If in the case of *Somerville vs. Johnson*, the tenant for life was entitled to the increase, because, otherwise, what was designed as a bounty might prove a loss. Why may not the same reasons apply in behalf of these infants? It is impossible to suppose that the testator designed that his will should receive a construction by which the appellant and Mrs. Floyd would be entitled to the increase of all the animate property, if thereby the trustee would be prevented from carrying on the estate, and keeping the whole together for the ultimate benefit of the *cestui que trusts* in remainder. By

one interpretation, the appellant and the other parties would be benefitted, the former immediately, and the latter remotely: by the other, all the advantages would enure to the appellant and Mrs. Floyd, and all the losses fall on the remainder men.

But then it is said that the words in the will by which he devises "the farm, together with the rest of the property so as aforesaid left in trust, to the children of Mrs. Floyd," most clearly show that he designed for them only what might remain of the original property at the arrival at age of her youngest child, because if he had intended the increase to go over with the corpus he would have said so. It may, with as much force be argued, that if he had intended the increase to pass to Holmes and Mrs. Floyd, and not as part of the trust estate, he would have used a word more expressive of such purpose than "income;" and if no words be used of contrary effect the issue would be so held by the trustee, as owner of the legal estate. It is supposed that the will shows by these terms what the testator designed should go to Mrs. Floyd's children at the termination of the trust. But effect is sometimes—nay often—given to wills beyond the terms employed. In *Hamilton vs. Cragg*, 6 *H. & J.*, 16, a testator left to a person, for life, certain negroes—men and women—*by name*, "to possess and enjoy during her natural life, them and their increase, and after her death the above *named* negroes to be free." There, as here, there was no limitation over of the increase. It was decided, however, that the increase born during the lifetime of the tenant for life, were not slaves, but became free at her death; because, though not directed to be free, and the emancipation was confined in terms to the *above named negroes*, it was merely descriptive of the persons who were to take their freedom; and as the will made no difference in the condition of the mother and children, during Mrs. Turner's life, none at her death was intended, but all were equally the objects of the benevolence of the testatrix. In the case before us the legal estate in the corpus is in the appellee, and unless the increase be given to another expressly or by necessary implication, it must accom-

pany that title, and constitute a part of the trust property, 6 *G. & J.*, 185.

But it is only necessary to extend this view of the appellant's counsel to show that the position is untenable. The application of the income does not cease at the death of Holmes, though his interest then terminates. After that event it is still to be applied for "the mutual benefit of Mrs. Floyd and her children," and, at her death, for the use and benefit of her children, until the majority of the youngest, when the trust is to terminate. After the death of the appellant, according to the view taken by his counsel, the increase must be divided between Mrs. Floyd and her children, and after her death between the children themselves, until the termination of the trust. Does any one suppose that the testator intended that these children should, during the trust, receive the issue or increase as separate and apart from the trust estate? So long as they might be minors such increase would then go to their guardian, and the trustee would have no control over it, for when once separated from the trust property it becomes a legal estate in the children, and the appellees' authority over it ceases. It might happen, as before observed, that the estate would be diminishing in value, for want of efficient force to work it advantageously— indeed producing no income at all, when the children, the only persons interested in the estate, might have abundant force for the purpose, by means of the issue delivered to them as income, which, however, the trustee could not use for that purpose. It seems to me that a result that would work such injury to the infant *cestui que trusts*, could not have been contemplated by the testator; and as this is a legitimate deduction from the construction placed on his will by the appellant, it cannot be supposed that he intended, by using the word "income," in connection with the devise to him and Mrs. Floyd, that they should take the increase out of the possession of the trustee, as separate and distinct from the trust property, and thus defeat the objects of creating the trust.

There is another view which, in my opinion, shows that

69    v.4

the testator did not design that his will should be construed as suggested on the part of the appellant. If the income embraces the increase of animate property, on the authority of the cases quoted, the parallel should be extended as far as they can be said to run together. The words of this will are similar to those employed in the deed in *Hope vs. Hutchins.* In the one the property and the profits arising therefrom were reserved to Mrs. Hope during her natural life; in the other the income arising from the property is to be applied during the life of William Holmes. The Court of Appeals decided, that Mrs. Hope took only a usufructuary interest, during her life, in the increase as well as the corpus of the estate. If this case be relied on to give title to Holmes in the issue of the female slaves, I do not perceive how he is to avoid its effect in limiting his enjoyment of the income, from whatever source, to his natural life. This difficulty, however, is obviated by the construction which I put on the will, which is, that the whole estate, including the increase of the negroes, shall be kept together as trust property, the proceeds to be applied as directed by the will. In this way the expenses of the young negroes will be paid by the estate, and the loss to the *cestui que trusts,* by reason of any diminution of the income on this account, will ultimately be made up to them by the increased value and future earnings of the negroes so reared. While this interpretation does no injustice to the parties first entitled to the enjoyment of the estate, it commends itself to our acceptance, by the benefits it secures to the other objects of the testator's affection and benevolence.

For these reasons, I am of opinion that the decree of the chancellor dismissing the bill of complaint should be affirmed.

MASON, J., delivered his opinion as follows:

I concur in the conclusion to which our brother, Judge TUCK, arrives.

With him, I think it was the manifest design of the testator that his *whole estate,* real and personal, was to be kept together during the lives of his uncle and aunt, that the net

proceeds of the entire property were to be appropriated to their mutual benefit during their lives, and after their death that it should pass to the children of Mrs. Floyd, *entire and unsevered*, with all the additions which might in the meantime have been made to it.

In the absence of any express interpretation by this court of the word *income*, I would be unwilling to attach to it a meaning, from analogy to other cases, in which, in my judgment, it never was intended to be used by the testator.

In my opinion the decree of the chancellor ought to be affirmed.

ECCLESTON, J., delivered his opinion as follows, in which LE GRAND, C. J., concurred:

The Maryland decisions have established the principle, that where a will gives a female slave to A, for life, or even for a shorter period, and then over to B, the issue of the slave, born during the continuance of the first estate belongs to A.

According to *Somerville vs. Johnson*, 1 *H. & McH.*, 348, and *Sutton vs. Crain*, 10 *G. & J.*, 479, giving the use of the mother will have the same effect upon the issue, as if the mother had been given. In *Hope vs. Hutchins*, 9 *G. & J.*, 79, the word *profits* is said to include the children of female slaves. See also *Sutton vs. Crain*, as to *profits*.

In this case the testator gave, with other real and personal property, sundry negroes, in trust, "to and for the following uses and purposes, that is to say, the income arising therefrom to be applied to the mutual benefit of my uncle, William Holmes, during the life of my said uncle and my aunt, Sarah Floyd, and after the death of my said uncle, to the mutual benefit of my aunt, Sarah Floyd, and her children, and after the death of my aunt, Sarah Floyd, to the use and benefit of the children of my said aunt, Sarah Floyd, until the youngest shall arrive at the age of twenty-one years; and then I will and devise the said farm called Rose Hill, together with the rest of the property so as aforesaid left in trust, to the children of my aunt, Sarah Floyd, to them and their heirs forever, share and share alike."

This case is said to be so essentially different from the previous decisions, that they can have no proper bearing upon it. Here a trust is created, whereas there was none in either of the others. To give force to this view of the subject, it is contended, that the two principal grounds, on which the issue are to go with the life estate, instead of to the remainder man; (which are to be found in the opinion of Mr. Dulany 1 *H. & McH.*, 353, and which have since been adopted,) cannot apply here; because the trustee is the person to provide for the support of the children, and the loss of time by the mother, and the expense of her confinement, fall upon him. These expenses are to be paid out of the trust fund. The *cestui que trust* does not pay them, and he is not personally responsible for them. But we do not perceive how this argument can avail the appellees. For it is a matter of but little importance to the *cestui que trust,* whether he is personally subject to those losses, and compelled to pay out of his own pocket, those expenses; or whether, by them the trust fund, which he is entitled to receive, is reduced. If in the one case his receipts from the trust fund, are diminished to the same extent, which in the other, he would be required to pay out of his own purse, the reasons for giving him the issue of the slaves, in the latter case, would be equally applicable to the former.

The first of the two principal reasons assigned by Mr. Dulany for giving the issue to the tenant of the life estate is, because *"otherwise, having no interest worth regarding, he might not take care of the issue."* This reason can have no influence in opposition to the present claim of the appellant. Whilst the children remain in the possession of the trustee, whether for the benefit of the life estate, or that in remainder, it would be his duty, in the proper performance of his trust, to maintain and take care of them. When taken from the trustee, by the *cestui que trust* for life, they will be in the possession of the party, whose interest will prompt him to see they are provided for.

As the will directs the income of the property given in trust to be applied, during the life of the appellant, to the mutual benefit of him and Sarah Floyd, the important inquiry is,

whether the word *income* will include the negro children, born since the decease of the testator.

The adjudged cases have settled the principle, that the loss of service of the mother, with the expenses attendant upon her confinement, and the cost of maintaining the children, are such an interference with, or abatement from, the *use* or *profits* of the mother, as will make the children pass, as part of the *use* or *profits.* If so, why should they not pass as income? Like causes ought to produce like effects. The party entitled to the income arising from a negro woman, under the circumstances alluded to, would be subject to the same interference with, or abatement from his *income*, which the owner of the *use* or *profits* would have to bear or submit to.

In England "any extraordinary *bonus* or addition to the usual annual income of stock or other property, which is settled in trust for one for life with remainder over, must be treated as capital and added to the principal fund." *Hill on Trustees,* 386. Under such a rule a gift for life of the use or profits of a female slave, with remainder over, would not carry the issue to the tenant for life. But our courts for the reasons already stated, have held, that by virtue of such a gift, the tenant for life would be entitled to the issue. And we conceive the reasons for the Maryland construction ought to have the same effect in a gift of the *income*, as in that of the *use* or *profits.*

A suggestion has been made that admitting the word income includes issue, as well as hire, still the issue in this case will not go to the *cestui que trusts* for life, as their absolute property, but will be for their use and benefit during their lives only; and then go with the mothers, to those entitled in remainder, and for that purpose the issue should remain in the hands of the trustee. But we do not think so.

Where personal property is given in trust for the use of A for life, the annual income, as it arises, is his sole property, and is to be paid over to him; although in some instances where that is the case, the trustee might not be justified in delivering to him the principal. *Hill on Trustees,* 383, 384. If this be true, the *cestui que trusts* for life, in this case, have the exclu-

sive right to the hire, accruing during their lives, and no part of the same is to be refunded by their representatives, after their decease, for the benefit of any of the parties entitled to the slaves in remainder.

Our courts have decided that a bequest of the use of a negro woman to a person for life, gives to him, not only the hire, but her issue, born during his life; the issue is, therefore, part of the use as well as the hire, and if the hire is the sole and exclusive property of the life tenant, how can it be that the issue is not so likewise?

A gift of "profits" has been held to include the increase of female slaves. The word "income," when applied to negroes, we conceive to be as comprehensive as "use" or "profits." And it cannot be denied that this word *income*, as used in the will before us, gives to the *cestui que trusts* for life, the exclusive right to the hire, during the continuance of their life estates. If, therefore, the will is to be construed as passing but a life estate in the issue, the same word, in the same sentence, which includes both *hire* and *issue*, will be made to pass an absolute and unlimited right to the former, and only a limited estate in the latter.

We see nothing in the language of the will, from which the *actual* intent of the testator is to be considered different from what we have supposed to be the *legal* intent. For although by our construction, if the uncle and aunt should live for many years, it might happen, that they, by getting all the young negroes, would leave for those in remainder, only the old negroes of but little value, to suppose the testator did not design this, is to imagine, that he had more affection for the children of his aunt, than for her and his uncle. In the absence of proof to contrary, the natural inference would be, that the testator had quite as much, if not more, affection for his uncle and aunt, than for her children; the latter being one degree farther removed from him, as relatives.

In *Evans, et al., vs. Iglehart, et al.*, 6 *G. & J.*, 185, it is said, "that a life estate in a chattel may be granted for life to one person, and the same with its issue or increase, be limited over to another; but this cannot be done but by express words,

or necessary implication." There certainly are no express words, in this will, giving over the increase of the negroes; nor do we perceive any necessary implication by which it is effected. The income is first to be applied to the mutual benefit of the aunt and uncle, during *his* life, then to the benefit of the aunt and her children for her life, then for the use of the children, until the youngest arrives at age, and then the testator gives the farm "together with the rest of the property so as aforesaid left in trust," to the children and their heirs. It is very true, cases may be imagined where, for the purpose of giving effect to a plain and obvious intention of the testator, such language as this might be construed as including the issue or increase as part of the trust property, had there been no other disposition made of such issue or increase; but this, in our opinion, has been done, and consequently leaves no room for any such construction or implication. The plain and natural meaning of "the rest of the property so as aforesaid given *in* trust," we think, must be understood as passing to the children of Mrs. Floyd, all the trust property specifically enumerated in the will, remaining in existence when the life estates are at an end; and in the mean while, by the previous provisions, the income, (including the issue as well as hire of negroes,) goes to the different *cestui que trusts* for life. See *Worthington and Hicks, vs. McPherson,* 5 *Gill* 54. In this there is no forced construction or implication, whilst full effect is given to every portion of the language employed in the devise.

We have endeavoured to show, that the legal meaning of the word income, in such a case as this, will include the issue when applied to slaves:—not meaning however to deny that this might not be prevented by a manifest intention to the contrary. Then, in using the word income, the intention of the testator was to include the issue, unless the legal meaning is in conflict with his actual intent. The same may be said in regard to hire, for even there a plain intention might restrict the word income so as not to pass the hire. But it has not been, nor can it be denied, that here, this word does pass the hire to the *cestui que trusts* for life, absolutely. If this is so, the legal and actual intent agree. It is, therefore, difficult to

perceive how it can be said the testator did not design to use this word in its legal sense, when applied to the issue, but did so in reference to the hire, notwithstanding it is the same word in the same connection, which is to be construed in regard to both hire and issue.

There is no general direction, or special power, expressly given, for the trustee to cultivate or carry on the farm, under his own management or control, and therefore he is not bound to do so, but may lease the land, and hire out the negroes. Inasmuch as the will does not clearly make it the duty of the trustee to cultivate the farm, there can be no necessary implication that the testator intended he should hold the young negroes as well as the old ones, until the termination of the trust, for the purpose of cultivating the land.

In *Sutton vs. Crain*, the court treat the word *profits* as including the *increase* of slaves; and the increase as profits covered by the word *use*, except where the term *use* is spoken of by the testator as "*hire or use*," which expression is considered as qualifying or restricting the meaning of the word *use*, by reason of its standing in connection with the word *hire*. But when the former word is used by itself, or not so connected, then it does include the increase "as profits from the use," The language of the court is, "And where it in the second place occurs, it is connected with the word hire—'*hire or use*;' the term *use* being there qualified by its connection with the word '*hire*,' as if the testator had been apprised, that without the word '*hire*' and by the word '*use*' standing alone, the issue of the slaves bequeathed to the grandchildren might have been sold as profits from the use, for the maintenance and education of his grandchildren, which clearly was not his design, the hire or use being only appropriated to these objects. But when the testator uses the word 'use' in the third instance, which is in the bequest now under consideration, the word '*hire*' is not connected with '*use*,' as immediately preceding in the same clause; nor is the increase given over as in the first instance." And the court then come to the conclusion, that giving to Mrs. Ann Watts the exclusive use of negro Sarah until the youngest of the testator's grandchildren should arrive

at age, gave her the issue of Sarah born during that period. And there is nothing which indicates any intention in the court to restrict the title of Mrs. Watts, in the issue so born, simply to a life estate in her. This too is under a will in which, it will be seen, the testator gave Sarah, with other negroes, to his grandchildren, to be distributed among them on their arrival at age and not before; but directing the *"hire or use"* of the negroes to be applied to the education and maintenance of the grandchildren until distribution could be made. He then says: "It is, however, my desire, that their mother, Ann Watts, shall have the exclusive use of negro *Sarah* until the youngest of my said grandchildren arrives at age." Here is a gift of the woman to the grandchildren, with direction that her *hire or use* shall be applied for their benefit until a distribution of the negroes, (including Sarah,) shall take place. And a simple reservation of her use in favor of Ann Watts, until the youngest grandchild's arrival at age, is held to confer on Mrs. Watts the increase born during her right to the use of the negro.

In the will before us, the word *income* is not limited or restricted by standing in connection with the word hire, or with any other qualifying word; nor is the *increase* arising during the life estate given over by any express language. If it be given over at all, it can only be so by implication, or by giving such a construction to the subsequent bequests of the income for life, or to the bequest of "the rest of the property, so as aforesaid left in trust, to the children of my aunt, Sarah Floyd;" which implication or construction we think is not warranted in this instance, as we have said in a previous part of this opinion.

When, in *Sutton vs. Crain,* the word use, in the first instance, spoken of by the court as being so restricted as not to pass the increase absolutely to Mrs. Watts, they hold this to be so, because the increase is bequeathed over. The language of the will here alluded to, (after giving to Mrs. Watts several articles of property,) is, "also, during her life, the use of negroes Nell, Anna and Daniel, after which they and their increase to be the right and estate of my son, Richard Henry

70     v.4

Watts." Whilst discussing the true interpretation and effect of the word *use*, when unconnected with any qualifying word or expression in regard to Sarah or her issue, the court say: "But where it first occurs, it is to be remarked, that the testator seems to have been aware, that by the use of the term, the right to the issue would be carried to the legatee for life; and, therefore, he bequeaths over the increase."

This case we think fully establishes, that when, in a bequest of the *use* of a female slave for the life of the legatee or for a term of years, or where the slave is bequeathed with the profits of her hire or use to one person, and the use only is reserved to another for life or for a term of years, such bequest transfers absolutely to the party entitled to the limited use, the issue of the woman born during that limited estate or usufructuary right, whenever the word use is not qualified by some other word or expression; and that this term will give the issue "as profits arising from the use."

If then the increase is part of the use or profits, so in our opinion it must be part of the *income*. And this word does not, as we can perceive, stand in any qualifying or restrictive connection, whether we look only to the portion of the will where it occurs or to the whole instrument.

We think the decree of the chancellor should be reversed and the cause remanded; but the decree must be affirmed in consequence of an equal division in the court.

Chief Justice LE GRAND concurred in this opinion.

*Decree affirmed.*